## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM WILSON, | No. 4:20-CV-00682 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| LT. KAUFFMAN, LT. WIAN, and ERIN BROWN, | |
| Defendants. | |

## MEMORANDUM OPINION

### FEBRUARY 8, 2023

On April 24, 2020, Plaintiff William Wilson, a Pennsylvania state inmate, currently confined in the State Correctional Institution, Frackville, Pennsylvania ("SCI-Frackville"), filed the above captioned civil rights action pursuant to 42 U.S.C. § 1983.[1]  The action proceeds via an amended complaint, filed on September 14, 2020.[2]  The named Defendants are Erin Brown, Director of the Office of Population Management (OPM) at SCI-Camp Hill, and the following employees at the Benner Township State Correctional Institution ("SCI-Benner"), Bellefonte, Pennsylvania, Plaintiff's former place of confinement: Superintendent Scott Klingfelter; Deputy Superintendent Bradley Booher; Program Manager Jennifer Rossman; Major Curtis Grice; RHU Captain W.P. Foster; Security

---

[1]   Doc. 1.
[2]   Doc. 18.

Lieutenants Kauffman and Wian.[3]  Wilson claims that the named Defendants are responsible for him being assaulted on March 9, 2019 at SCI-Benner by two brothers of the victim in his criminal case.[4]

By Memorandum and Order dated September 15, 2021, Defendants Booher, Klinefelter, Rossman, Grice and Foster were dismissed from the above captioned action and remaining Defendants Kauffman, Wian and Brown were directed to file an appropriate pretrial motion.[5]

Presently pending is remaining Defendants' motion for summary judgment[6] pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion for summary judgment.

I.   STANDARD OF REVIEW

Summary judgment should be granted when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.[7]  A disputed fact is material when it could affect the outcome of the suit under the governing substantive law.[8]  A dispute is genuine if

---

[3]   *Id*.
[4]   *Id*.
[5]   Docs. 32, 33.
[6]   Doc. 49.
[7]   Fed. R. Civ. P. 56(c).
[8]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[9]  The Court should view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor.[10]  When the non-moving party fails to refute or oppose a fact, it may be deemed admitted.[11]  Initially, the moving party must show the absence of a genuine issue concerning any material fact.[12]  Once the moving party has satisfied its burden, the non-moving party, "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."[13]  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."[14]  "If a party ... fails to properly address another party's assertion of fact as required by Rule 56(c)," a court may grant summary judgment or consider the fact undisputed for purposes of the motion.[15]

If the court determines that "the record taken as a whole could not lead a rational trier or fact to find for the non-moving party, there is no 'genuine issue for

---

[9]   *Id*. at 250.
[10]  *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).
[11]  *See* Fed. R. Civ. P. 56(e)(2); Local R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").
[12]  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[13]  *Anderson*, 477 U.S. at 257.
[14]  *Hugh*, 418 F.3d at 267 (citing *Anderson*, 477 U.S. at 251).
[15]  Fed. R. Civ. P. 56(e)(2)-(3).

trial'."[16]  Rule 56 mandates the entry of summary judgment against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[17]

## II.   STATEMENT OF MATERIAL FACTS

On October 25, 2018, following a jury trial in which Wilson was convicted of, *inter alia*, Murder of the Third Degree and Unsworn Falsification to Authorities, Wilson was sentenced by the Court of Common Pleas of Montgomery County to a period of incarceration within the custody of the Pennsylvania Department of Corrections (DOC).[18]

On November 8, 2018, Wilson was received into DOC custody and housed in the Phoenix State Correctional Institution, ("SCI-Phoenix"), Collegeville, Pennsylvania.[19]

On November 16, 2018, while Wilson was housed at SCI- Phoenix, he was sitting at a table in the dining hall when he was "hit from behind by a guy[,]" another inmate, that Wilson did not know.[20]

On November 19, 2018 Wilson appeared for a misconduct hearing on a misconduct he received as a result of the November 16, 2018 incident.[21]  The

---

[16]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).
[17]  *Celotex Corp.*, 477 U.S. at 322.
[18]  Doc. 50-1 at 28.
[19]  Doc. 50-2 at 3.
[20]  Doc. 50-3 at 1.
[21]  Doc. 50-3 at 3.

misconduct revealed that Wilson "was on the ground fighting Inmate Scott (#MU6165) [who] was on top punching."[22]  The misconduct was dismissed with prejudice.[23]

On November 21, 2018, Wilson was transferred from SCI-Phoenix to SCI-Camp Hill[24], so that he could be received and initially classified pursuant to DOC Po. No. 11.2.1 "Reception and Classification."[25]  He remained at SCI-Camp Hill until January 24, 2019.[26]

On January 15, 2019, while housed at SCI-Camp Hill, a Permanent Transfer Petition, transferring Wilson to SCI-Benner Township, was prepared by SCI-Camp Hill Official Misiti.[27]  The petition indicated that Wilson, himself, was a risk for institutional assaultive behavior.[28]  At the time of the petition, Wilson had one documented separation from Inmate Conn (#NQ4829), entered on January 8, 2019, noting that "in 2005 Conn and Wilson were codefendants in a federal case."[29]  On January 16, 2019, the transfer petition was approved by SCI-Camp Hill Official Hendricks and Wilson was transferred to SCI-Benner Township on January 24,

---

22   Doc. 50-3 at 2.
23   Doc. 50-3 at 3.
24   Doc. 50-2 at 3.
25   Doc. 50-4.
26   Doc. 50-2 at 3.
27   Doc. 50-5 at 1.
28   *Id.*
29   Doc. 50-10 at 1.

2019.[30]  Wilson remained in general population at SCI-Benner from January 24, 2019 to January 28, 2019.[31]

On January 28, 2019, Other Report No. D269912[32] was prepared by Defendant, Lt. Wian, and served on Wilson, indicating that Wilson was being placed on Administrative Custody pursuant to Administrative Directive 802 Section 1.B.1[33] as he is in danger from some person(s) in the facility and cannot be protected by alternate measures.[34]

On January 29, 2019, the Program Review Committee (PRC) conducted an in person 802 hearing on Wilson's Other Report D26992.[35]  The PRC noted that Wilson had not yet talked with Security and had no idea why he was housed in the RHU. [36] The PRC advised that Wilson would need to be reviewed by the Security

---

[30]  Doc. 50-5 at 1.

[31]  Doc. 50-2 at 3.

[32]  DC-ADM 802 1.B.6 establishes that:
> Whenever practical, written notice of the reasons for AC placement is given to the inmate prior to placement, but in all cases within 24 hours after placement. The written notice shall be prepared on the DC-141, Part 1, by indicating "Other."

[33]  DC-ADM 802 is the Department of Corrections Policy Statement on "Administrative Custody Procedures, which states, in pertinent part:
> 1. A general population inmate may be assigned AC status and placed in a Security Level (SL) 5 Housing Unit, including a Psychiatric Observation Cell (POC), by order of the Shift Commander and/or by order of a psychiatrist or a Certified Registered Nurse Practitioner – Psychiatric Service (PCRNP) for the following reason(s):
>> a.  the inmate is in danger from some person(s) in the facility and cannot be protected by alternate measures and/or the inmate is a danger to some person(s) in the facility and the person(s) cannot be protected by alternate measures

*See* DC-ADM 802, Administrative Custody Procedures Manual at § 1(B)(1)(a).

[34]  Doc. 50-6 at 1.

[35]  Doc. 64-1 at 7.

[36]  *Id.*

Office who will then provide a recommendation to PRC regarding his status.[37]

While in Administrative Custody, the PRC conducted Administrative Reviews of Wilson's Administrative Custody (AC) status on February 5, February 12, February 19, and February 26, 2019.[38]  Each time, the PRC indicated that "Inmate Wilson was placed in AC status due to being in danger from others" and recommended "continue AC status pending Security Office review and recommendation."[39]

On February 19, 2019, Wilson submitted an Inmate's Request to Staff Member, inquiring as to why he has been housed in the RHU since January 28, 2019, which he claims is longer than the fifteen days permitted by DOC policy.[40] On February 26, 2019, staff responded that Plaintiff's "802 is for danger to/from others, not for investigation" and that the "15 day time frame only applies to 802's that are specifically written for Letter F-being under investigation."[41]

On February 26, 2019, the PRC continued Wilson's placement in AC status, approved him for one phone call and indicated that he would be reviewed again in

---

[37]  *Id.*

[38]  Doc. 50-7 at 1-4.

[39]  *Id.*

[40]  Doc. 62-1 at 8. Wilson also submitted two Inmate's Request to Staff Members on February 2, 2019 inquiring as to the reason he was detained in Administrative Custody and notifying staff that while in AC he was being denied use of the phone, his tablet, television and commissary, which Plaintiff believed to be punishment "for nothing."  Doc. 18-1 at 4,5. Staff response was that they were waiting for an "update from security" and that "this is not a form of punishment."  *Id.*

[41]  *Id.*

one week.[42]

On March 6, 2019, Plaintiff was released back into general population at
SCI-Benner.[43]

On March 9, 2019 Plaintiff was involved in an inmate on inmate altercation
with four other inmates: "Washington" (#LL3032); "Williams-Smith" (#HJ2598);
"Scott" (#ND8831); and, "Gold" (#ME0952).[44]  Wilson was immediately seen in
the medical department after the altercation.[45]  He was assessed by medical,
photographed and released with no treatment rendered, noting that although
Plaintiff "complained of a headache, lightheaded feeling [and] nausea," he "felt
better after sitting in medical for a few minutes and then was escorted to RHU by
security."[46]

After the altercation, Plaintiff was issued an Other Report, pursuant to
ADM-802, Section 1.B.1.f, placing him in Administrative Custody "because he has
been charged with, or is under investigation for a violation of facility rules and
there is a need for increased control pending disposition of charges and completion
of the investigation."[47]

---

[42]   Doc. 50-7 at 4.
[43]   Doc. 50 at 6; Doc. 64 at 3.
[44]   Doc. 50 at 6; Doc. 50-9.
[45]   Doc. 50-9 at 1.
[46]   *Id.*
[47]   Doc. 50-8 at 2.

On March 11, 2019, Defendant Kauffman wrote to Superintendent Marsh concerning a Transfer/Separation Request for Wilson, based on the following:

> The Security Office is recommending that Inmate NP9531 William Wilson be transferred from SCI-Benner Township and separated from Inmates MV7680 Alexander Scott and ND8831 Aykee Scott.
>
> On March 9, 2019, Inmate Wilson was involved in an altercation at SCI-Benner Township on the East Walks.  During the incident, Inmate Wilson was knocked to the ground and struck by multiple inmates. Inmate Wilson was able to evade the attack and get away from the inmates.  Inmate Wilson was pursued and struck again.  Responding staff members ordered the inmates to be restrained.
>
> Following the incident, a BII "Jump Team" was deployed to SCI-Benner Township.  During the interviews it was learned that Inmate Wilson is incarcerated for conspiracy to commit murder.   Inmate Wilson's crime was against the 16 year old brother of Inmates MV7680 and ND8831 Scott.  The incident was a direct result of Inmate Wilson's crime.
>
> Due to the ongoing threat to Inmate Wilson, it is the recommendation of the Security Office that Inmate Wilson be transferred to another facility and the above separations be listed in his file.[48]

Wilson's Permanent Transfer Petition reveals that additional information was obtained by the Security Office that required the addition of a separation on MU6165 Aaron Scott currently housed at SCI-Phoenix.[49]  Aaron Scott is the brother of MV7680 Alexander Scott and ND88831 Aykee Scott.[50]  MV7680 Scott received third party mail from MU6165 Scott on March 15, 2019 and the letter

---

[48] Doc. 50-11 at 1.
[49] Doc. 50-12 at 2.
[50] *Id.*

included information that was used to determine that both inmates were brothers.[51]

The letter also included information pertaining to NP9531 Wilson being housed at

SCI-Benner Township.[52]

On March 20, 2019, Wilson filed Grievance No. 793332 regarding the

March 9, 2019 incident, alleging that "SCI-Benner knew of the threats against

[him] but still released [him] from the RHU back into population on March 6,

2019."[53]  He requested to be transferred "as soon as possible."[54]

On March 22, 2019,[55] Wilson was issued Misconduct Report No. D269943,

charging him with Fighting, a Class 1 violation, as follows:

> On 3/9/2019 at 1745 hours, inmates LL3032 Washington, HJ2598
> Williams-Smith, ND8831 Scott, ME0952Gold and NP9531 Wilson
> were observed fighting on the East Walks [while] returning from the
> Inmate Dining Hall. All of the listed inmates were observed exchanging
> strikes with their hands and feet.  The inmates were given direct orders
> to stop fighting and dispersed from the area of the incident.[56]

On April 29, 2019, Wilson's Grievance No. 793332 was denied as follows:

> In your grievance, you allege that you were released to general
> population on March 6, 2019 and the staff at SCI-Benner Township
> knew that there was a threat to your safety.  You are requesting to be
> transferred to another institution.

> I spoke to you regarding this grievance.  I explained to you that at the
> time of your release, there was not [a] verified threat to your safety.

---

[51]  *Id.*

[52]  *Id.*

[53]  Doc. 50-13 at 1.

[54]  *Id.*

[55]  The Misconduct Report indicates that the delay in submitting the report was due to an
investigation being conducted into the incident.

[56]  Doc. 50-8.

You were interviewed by the Security Office on 3-6-19 prior to your release.  Based on the interview with you, a PRC action was drafted requesting your release to general population.  While it is unfortunate that you were assaulted, every attempt to guarantee your safety was made by the staff at SCI-Benner Township.  The assault on you was investigated and it was determined that you were not safe in this facility and the separation procedures were initiated.  You were placed on AC status at that time.

Based on the findings, Grievance #79332 is denied.  Your requested relief of an unspecified amount of compensation for physical, emotional, and psychological damages and a transfer to a closer jail in your region is also denied.[57]

On April 9, 2019 Wilson was transferred from SCI-Benner Township back to SCI-Phoenix.[58]

## III.  DISCUSSION

Plaintiff brings Eighth Amendment claims under 42 U.S.C. § 1983, which "provides a cause of action against state actors who violate an individual's rights under federal law."[59]  Section 1983 does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws."[60]  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[61]

---

[57]  Doc. 50-13 at 2.
[58]  Doc. 50-2 at 3.
[59]  *Filarsky v. Delia*, 566 U.S. 377, 380 (2012).
[60]  *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).
[61]  *West v. Atkins*, 487 U.S. 42, 48 (1988).

Importantly, a plaintiff must plead a defendant's personal involvement in the alleged deprivation of his constitutional right.[62]  That is because, as stated in the text of § 1983 itself, only a person who "subjects, or causes to be subjected" another person to a civil rights violation can be held liable under § 1983.  Thus, each defendant can be held liable only for his or her own conduct.[63]

The doctrine of *respondeat superior*, which makes an employer automatically responsible for the wrongdoing of employees, does not apply under § 1983.[64]  Therefore, supervisor-defendants cannot be held liable for every illegal act that takes place in a correctional facility.  Rather, they can be held liable only for their own conduct.

Our Court of Appeals has identified two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates.  First, liability may attach if the supervisor, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which

---

[62]  *See, e.g., Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

[63]  *See, e.g.*, *id.*; *see also Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016); *Barkes v. First Correctional Medical*, 766 F.3d 307, 316 (3d Cir. 2014) (*rev'd sub nom. on other grounds* 575 U.S. 822 (2015)); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005) ("To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it.") (citing *C.H. v. Oliva*, 226 F.3d 198, 201-02 (3d Cir. 2000) (*en banc*)).

[64]  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)*.

directly caused [the] constitutional harm."[65]  Second, "a supervisor may be

personally liable under § 1983 if he or she participated in violating the plaintiff's

rights, directed others to violate them, or, as the person in charge, had knowledge

of and acquiesced" in the subordinate's unconstitutional conduct.[66]  "Allegations of

participation or actual knowledge and acquiescence, however, must be made with

appropriate particularity."[67]

    1.    <u>Plaintiff's claims against Defendant Brown</u>

Plaintiff claims that Defendant Brown, as Director of OPM, should not have

allowed Plaintiff to be transferred to SCI-Benner[68] and that she failed in her duty to

protect him from further harm "by her not completely reviewing [his] files/history

and further seeing that it would not be in the Plaintiff's best interest to be classified

to SCI-Benner."[69]  Brown relies heavily on the duties of the OPM as enumerated in

the DOC Pol. No. 11.1.1, Population Management Procedures Manual, Section 2 –

Transfer Petition System.[70]  In particular, Wilson claims that DOC Pol. No. 11.1.1

sets forth Brown's responsibilities as follows,

> (1)    maintain the administration of the Transfer Petition System
> (TPS);

---

[65]  *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)).

[66]  *Id*. (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995)).

[67]  *Rode*, 845 F.2d at 1208.

[68]  Doc. 18.

[69]  Doc. 62.

[70]  Doc. 62-1.

(2)    review all Transfer Petition Requests entered into the TPS, to determine if the required level of approval for each Transfer Petition has been met;

(3)    review and either approve or deny, all transfers outlined in the **Levels of Approval Required for Inmate Transfers**, which require OPM approval;

(4)    review and either approve or deny all Administrative Separations from staff and inmates;

(5)    review and either approve or deny Initial Transfer Petitions, Permanent Transfer Petitions, exceptions for IBTs, and Temporary Transfers; and

(6)    review all Special Transfers.[71]

The DOC Defendants seeks summary judgment on behalf of Defendant Brown because she had no personal involvement in the transfer of Plaintiff to SCI-Benner and because Plaintiff's claims are premised on *respondent superior*. The Court agrees.

The record evidence reveals that Wilson was initially received into DOC custody on November 8, 2018 and placed in SCI-Phoenix. Plaintiff did not have any separations from staff or other inmates at this time. On November 16, 2018, Wilson, in an isolated incident, was assaulted from behind by an inmate Wilson did not know. As a result of this incident, on January 15, 2019, a Permanent Transfer Petition was requested by DOC official Misiti; on January 24, 2019, the petition was approved by DOC official Hendricks. There is no record evidence that Defendant Brown was personally involved in the transfer of Wilson from SCI-Phoenix to SCI-Brenner. To the extent that Plaintiff relies on DOC Pol. No. 11.1.1

---

[71]  *Id*. (emphasis in original).

for the argument that it was Brown's responsibility to oversee his transfer, DOC Pol. No. 11.1.1 specifically indicates that the "Director/designee" of OPM shall conduct the enumerated functions listed by Plaintiff.  It is readily plausible that someone, other than Defendant Brown was an appropriate designee to effectuate Plaintiff's transfer.  As such, it appears that Plaintiff is attempting to impose liability on Defendant Brown, solely on the basis of *respondent superior*, which he cannot do.  As set forth above, only a person who "subjects or causes to be subjected" a plaintiff to a deprivation of rights can be held liable under § 1983. The doctrine of *respondeat superior* does not apply under § 1983.  Accordingly, Defendant Brown is entitled to summary judgment.

> 2.    <u>Defendants Kauffman and Wain</u>

The Cruel and Unusual Punishment Clause of the Eighth Amendment imposes on prison officials "a duty to protect prisoners from violence at the hands of other prisoners."[72]  "Being violently assaulted in prison is simply 'not part of the penalty that criminal offenders pay for their offenses against society.' "[73]  To survive summary judgment on a claim for damages against a prison official for failure to protect an inmate from violence caused by other inmates, as is the case here, a plaintiff must produce sufficient evidence establishing that: (1) he was incarcerated under conditions posing a substantial risk of serious harm (an

---

[72] *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)*; Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).
[73] *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

objective inquiry); (2) the prison official acted with deliberate indifference to the substantial risk to his health and safety (a subjective inquiry); and, (3) the prison official's deliberate indifference caused him harm.[74]

The first element sets out an objective inquiry: that the official "knowingly and unreasonably disregarded an objectively intolerable risk of harm."[75] The second element, "deliberate indifference," is a subjective standard: " 'the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.' "[76] That is because "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[77] The plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."[78] "Deliberate indifference is a subjective state of mind that can, like any

---

[74] *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (citing *Farmer*, 511 U.S. at 834; *Hamilton*, 117 F.3d at 746).

[75] *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001).

[76] *Bistrian*, 696 F.3d at 367 (quoting *Beers-Capitol*, 256 F.3d at 125).

[77] *Farmer*, 511 U.S. at 837.

[78] *Id*. at 842.

other form of scienter, be proven through circumstantial evidence and witness testimony."[79]

Prison officials may escape liability for deliberate indifference claims in several ways. They "might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."[80] "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."[81] "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable" on a failure-to-protect claim.[82]

Here, Plaintiff alleges that Defendants Wian and Kauffman were aware of the dangerous condition general population presented for Plaintiff when they moved him into Administrative Custody. He further alleges that these Defendants subsequently exercised deliberate indifference to this danger when they released him back into general population on March 6, 2019, only for him to be assaulted

---

[79] *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017); *see also Bistrian*, 696 F.3d at 367.

[80] *Farmer*, 511 U.S. at 844

[81] *Id*.

[82] *Id*. at 845; *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (noting that prison officials have "a duty ... to take reasonable measures to protect prisoners from violence at the hands of other prisoners") (quotation marks omitted).

on March 9, 2109.[83]  Defendants maintain that Wilson cannot produce competent

admissible evidence establishing that Defendants were deliberately indifferent to

any substantial risk of harm to Wilson's health and safety.[84]  The Court disagrees.

The record evidence establishes that on January 28, 2019, Plaintiff was

issued Other Report No. D269912, placing him in Administrative Custody

pursuant to Administrative Directive 802 Section 1.B.1, because he was in danger

from some person or persons in the facility and could not be protected by alternate

measures.[85]  Although the documentary evidence does not reveal the underlying

danger Plaintiff was facing, Defendants invite the Court's attention to Exhibit 6,

attached to their Statement of Material Facts to support the underlying basis for

Wilson's placement in Administrative Custody.[86]  Defendants reference this

document as the affidavit of Defendant Kauffman.[87]  Defendants argue that this

Affidavit indicates that the reason Wilson was placed in Administrative Custody

was because Wilson reported that he was approached by Inmate Scott (#MV76870)

and, although Plaintiff allegedly reported to Kauffman that the situation was "not

that serious," Defendants Wian and Kauffman believed the situation serious

enough to move plaintiff to Administrative Custody.[88]  Plaintiff refutes these

---

[83]  Doc. 18.
[84]  Doc. 57.
[85]  Doc. 50-6.
[86]  Doc. 50-6.
[87]  Defendants' Exhibit 6 is a copy of Other Report No. D269912. Defendant Kauffman's affidavit does not appear as Defendants' Exhibit 6, nor is it located elsewhere in the record.
[88]  Doc. 50 at 5.

statements in his statement of material facts, claiming that he was never approached by Inmate Scott (#MV76870), nor did he report to anybody about being approached or threatened by Inmate Scott (#MV76870).[89]  He further claims that the many Inmate's Requests to Staff Member he submitted, indicate that he was without knowledge as to his placement in Administrative Custody.[90] Clearly a genuine issue of material fact exists as to the nature of the underlying danger that placed Wilson in Administrative Custody.  However, regardless of the identity of the underlying danger, the record demonstrates that Plaintiff was moved to Administrative Custody because general population at SCI-Benner posed to him a substantial risk of harm.

Additional questions of fact arise as to whether Defendant Wian and Kauffman were deliberately indifferent to the substantial risk of harm to Wilson's health and safety when they released him back into general population.  Although the record evidence includes copies of each of Plaintiff's PRC Administrative Custody reviews pursuant to DC-ADM 802, the record is devoid of any documentary evidence pertaining to Plaintiff's release from Administrative Custody back to general population.[91]  Defendants, again relying on an affidavit that is not part of the record, posit that during a meeting on March 6, 2019 Wilson

---

[89]  Doc. 64 at 3.
[90]  Doc. 62 at 3-5.
[91]  DC-ADM 802, Section 4 enumerates the procedures for release from Administrative Custody.

"believed the situation was 'not that serious' and that he wanted to be released from administrative custody status so that he could resume his legal appeals" and that "per his request, Wilson was thus released from Administrative Custody and returned to general population, although not to the original block where he had been previously approached by Inmate Scott (#MV7680)".[92]  Plaintiff, refutes this, stating that while he did speak to Defendants Wian and Kauffman on March 6, 2019, it was Defendants who "told Plaintiff that they did not find any credible threats to Plaintiff's safety and based on the interview with Defendants the Plaintiff was released into general population."[93]  As such, the Court finds that the lack of documentary evidence for Wilson's release back to general population and the parties' conflicting accounts of Plaintiff's release to general population create genuine issues of material fact that preclude an award of summary judgment at this time.  Such issues include, but are not limited to, the underlying threat determining the need for Wilson's placement in Administrative Custody,[94] and the reasonableness of Defendants' actions in releasing Plaintiff to general population.

---

[92]  Doc. 57 at 10.
[93]  Doc. 18 at 8.
[94]  Pursuant to DC-ADM 802, Section 1.B.7:
The DC-141, Part 1, shall articulate the direct threat to the safety of persons or the clear threat to the safe and secure operations of the facility posed by the individual and shall include:
   a. the relationship between the threat the inmate poses, and the behaviors observed; and
   b. a description of why alternatives to restrictive housing cannot safely manage the threat posed by the inmate.

**IV.    CONCLUSION**

Based on the foregoing, the Court will grant in part and deny in part

Defendants' motion for summary judgment.  The Court will grant Defendants'

Rule 56 motion as to Wilson's claims against Defendant Brown.  The Court will

deny Defendants' motion as to Wilson's Eighth Amendment failure to protect

claim against Defendants Kauffman and Wian.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge